IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:13-cv-01550-SLD-JEH |
| | ) | |
| POLYONE CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:13-cv-01555-SLD-JEH |
| | ) | |
| POLYONE CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

These consolidated cases involve federal and state allegations of environmental violations at two polyvinyl chloride ("PVC") resin manufacturing facilities. Before the Court is Plaintiff United States of America's Assented-To Motion to Enter Consent Decree, ECF No. 7. The Consent Decree, ECF No. 4[1], resolves the civil liability of Defendant PolyOne Corporation ("PolyOne") and its successor, Mexichem Specialty Resins, Inc. ("Mexichem"), for claims brought by the United States and the State of Illinois[2] ("the Governments") under the Clean Air Act ("CAA"), 42 U.S.C. § 7401 *et seq.*, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.*, the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*,

---

[1] Unless otherwise stated, all docket citations reference the lead case, No. 1:13-cv-1550.
[2] The State of Illinois filed a parallel Complaint against PolyOne Corp two days after the United States filed its Complaint. *See* Compl., ECF No. 1, No. 13-cv-1555. The state and federal cases were consolidated. Order of Dec. 13, 2013, ECF No. 6, No. 1:13-cv-1555. The State of Illinois supports entry of the Consent Decree. Pl.'s Mot. Enter Consent Decree 2, ECF No. 7.

1

and relevant state laws. For the following reasons, the joint Motion to Enter Consent Decree, ECF No. 7, is GRANTED.

## BACKGROUND

The proposed Consent Decree covers PVC resin manufacturing plants in Pedricktown, New Jersey, and Henry, Illinois, formerly owned and operated by PolyOne. The resins PolyOne produced at the two facilities are used in door panels, carpet backing, textile inks, and certain foam product applications. Pl.'s Mem. in Supp. Mot. Enter Consent Decree 2, ECF No. 8. The United States alleges thirteen CAA violations, eight RCRA violations, and five CWA violations at these facilities. Compl. ¶¶ 40–177, ECF No. 1. These allegations arise from U.S. Environmental Protection Agency ("EPA") inspections of the Illinois facility in September 2004 and the New Jersey facility in April 2005. *Id.* ¶¶ 9, 12. The State brings identical claims for the alleged violations at the Illinois facility. *See* Compl. ¶¶ 32–80, ECF No. 1, No. 1:13-cv-01555.

### A. Clean Air Act Claims[3]

The PVC manufacturing facilities utilize vinyl chloride, which the CAA regulates as a hazardous air pollutant, due to its potential carcinogenic effects and connection to other health disorders. Compl. ¶¶ 15–23; 42 U.S.C. § 7412(b)(1), (d). The Governments claimed PolyOne failed to comply with leak detection and repair standards for valves at its Illinois facility established by regulations promulgated under the CAA, 40 C.F.R. § 61.65(b)(8)(ii)(B), and failed to maintain required records for a repair verification test, *id.* § 82.166(k), (m). Compl. ¶¶ 40–57. Regarding the New Jersey facility, the United States charged PolyOne with: calculating its residual vinyl chloride concentration once per month as opposed to daily, 40 C.F.R. § 61.64; failing to report its 24-hour average vinyl chloride concentration, *id.* §

---

[3] Many of these are simultaneously violations of the Illinois Environmental Protection Act ("IEPA"), 415 ILCS 5/1 *et seq.*, because the IEPA incorporates by reference sections 111, 112, 165 and 173 of the CAA. *See* 415 ILCS 5/9.1(d)(1).

61.70(c)(2)(v); failing to conduct the requisite type of analysis of solids cleaned out from the reactor, *id.* § 61.67(g)(3), and to report an accurate calculation of its 24-hour vinyl chloride concentration by virtue of its omission of that analysis, *id.* § 61.70(c)(2)(v); failing to analyze each in-process wastewater stream at its New Jersey facility as required by 40 C.F.R. § 61.67(g)(2); failing to measure vinyl chloride concentrations at the bottom of the reactor vessel at the New Jersey facility, *id.* § 61.67(g)(5)(i)(B); failing to comply with leak detection and repair standards for equipment, *id.* § 61.65(b)(8)(ii); failing to provide a timely initial notification pursuant to 40 C.F.R. § 63.697(a)(1); failing to timely submit a notification of compliance status required by 40 C.F.R. § 63.9(h)(2)(ii); failing to make initial and updated determinations of the average volatile hazardous air pollutant concentration for an off-site material stream at its New Jersey facility, *id.* § 63.683(b)(iii); and failing to maintain records of the quantity and concentration of the OxyVinyls company streams at the New Jersey facility, *id.* § 63.10(b). Compl. ¶¶ 58–111.

### B. Resource Conservation and Recovery Act Claims[4]

The facilities are subject to EPA regulations promulgated under the RCRA and parallel state regulations because both the New Jersey and Illinois sites generated and stored, and continue to generate and store, hazardous waste. Compl. ¶¶ 24–33; 42 U.S.C. § 6903(5). The Governments alleged that PolyOne violated the RCRA at the Illinois facility by: discharging wastewater to a neighboring facility without a permit to discharge wastewater and without sampling the water to determine whether it contained hazardous waste, 40 C.F.R. § 262.11; failing to comply with the requirements of 40 C.F.R. part 265, subpart J—which govern design, installation, and inspection of tank systems, among other substantive attributes—and of 40

---

[4] These counts were also brought under the parallel New Jersey and Illinois state regulations, as the EPA authorized these states to administer a state RCRA hazardous waste program in lieu of the federal program pursuant to 42 U.S.C. § 6926. *See* Compl. ¶¶ 26–28.

C.F.R. §§ 265.108–1091—which imposes requirements to control emissions from tank systems—for its concrete tank lift station; storing ignitable material inside a laboratory in a drum that could not be closed, 40 C.F.R. § 265.173(a); and failing to maintain records documenting inspections of collection jars and a 55-gallon drum used to collect hazardous waste, *id.* § 265.73(b)(5). At the New Jersey facility, the Governments claimed, PolyOne: failed to provide the proper identification number for hazardous wastes it shipped offsite on or about August 28, 2003, 40 C.F.R. § 262.20(a) (1993), and failed to notify each treatment or storage facility receiving this waste that the waste did not meet the requisite treatment standards, *id.* § 268.7(a)(4) (1993); and failed to document the refusal of a local hospital to receive familiarization from PolyOne on the types of hazardous waste handled at its facility, *id.* § 265.37(b) (1993). Compl. ¶¶ 112–154.

### C. Clean Water Act Claims

The Governments claimed that PolyOne had an incomplete and deficient Spill Prevention, Control and Countermeasure ("SPCC") Plan for oil spills at its New Jersey facility, in violation of regulations promulgated under the CWA. Compl. ¶¶ 28–31. Specifically, the Governments alleged, from at least October 19, 2002, until January 8, 2007, the facility's SPCC Plan: failed to state that drainage from a particular transformer did not flow to the facility wastewater treatment plant, but into either a pond catchment basin or lagoon to retain oil, and did not include a diversion system to return oil to the facility in the event of an uncontrolled discharge from the transformer, 40 C.F.R. § 112.7(c); and failed to state procedures and safeguards mandated by 40 C.F.R. § 112.8(b)–(d). PolyOne also allegedly failed to provide for engineered overfill protection to avoid discharges from a particular bulk storage container, *id.*

4

§ 112.8(c)(8), and failed to promptly address visible oil leaks from valves in a storage container, 112.8(c)(10). Compl. ¶¶ 155–75.

### D. Transfer of Ownership and Consent Decree

In May 2013, PolyOne Corp sold its vinyl dispersion, blending, and suspension resin business to Mexichem, which now owns and operates both the New Jersey and Illinois facilities. Pl.'s Mem. in Supp. Mot. Enter Consent Decree 2, ECF No. 8. Under the asset purchase agreement between Mexichem and PolyOne, Mexichem agreed to assume and perform all duties imposed by the anticipated Consent Decree not yet performed by PolyOne upon closing. *Id.* at ¶ 13. By November 19, 2013, the United States, Illinois, PolyOne and Mexichem had negotiated and signed the proposed Consent Decree. *See* Consent Decree 39–45, ECF No. 4.

Under the Decree, PolyOne will pay the United States a civil penalty of $245,000, plus interest accruing from the date the Decree was lodged with this Court; this sum includes $3,000—the penalty for the alleged SPCC violations—specifically designated for the Oil Spill Liability Trust Fund. *Id.* at ¶¶ 8–9. PolyOne will pay $35,000 to the State of Illinois, with interest accruing on amounts not paid within 30 days of the Decree taking effect. *Id.* at ¶¶ 9–10. Additionally, Mexichem and PolyOne will implement three Supplemental Environmental Projects ("SEP") at the Illinois facility valued at approximately $800,000. *Id.* at ¶ 18–27. In the SEPs, PolyOne will install and Mexichem will operate valves, storage tankage, and related equipment for (1) a diesel-powered air compressor, (2) a back-up diesel-powered generator to supply power to the existing cooling water or chilled water pumps, and (3) an automated chemical addition ("short stop") system to cease the polymerization process for reactors on a particular resin dispersion line. Consent Decree ¶ 18. The SEPs "are all directed at avoiding

5

unintentional releases, particularly during a power outage or other extraordinary event at the facility." Pl.'s Mem in Supp. Enter Consent Decree 6–7.

The Consent Decree also contains injunctive relief provisions governing Mexichem's ongoing operation of the New Jersey and Illinois facilities and aimed at bringing the facilities into compliance with the regulations they allegedly previously violated. In particular, the Illinois and New Jersey facilities must employ the Leak Detection and Elimination Programs specified in Appendices B and C-2 to the Decree, respectively. Consent Decree ¶ 14. Mexichem must comply with any applicable requirement stemming from the CAA, RCRA, and CWA. *Id.* at ¶ 12. Mexichem must also apply to the State of Illinois and the State of New Jersey to incorporate the emission limits and standards required by the Decree into Mexichem's state and federal permits. *Id.* Finally, Mexichem agrees to comply with more stringent National Emissions Standards for Hazardous Air Pollutants for Polyvinyl Chloride and Copolymers Production prior to their taking effect for the Mexichem facilities in April 2015. *See* Consent Decree ¶ 17; Pl.'s Mem in Supp. Enter Consent Decree 3 n.2; 77 Fed. Reg. 22848.

In accordance with 28 C.F.R. § 50.7, the United States announced the settlement and consent decree in the Federal Register on November 27, 2013; the notice stated that public comments on the Consent Decree would be accepted for 30 days. 78 Fed. Reg. 70960–03. The comment period closed without the U.S. Department of Justice receiving a single comment. Pl.'s Mem in Supp. Enter Consent Decree 2. The United States moves for entry of the Decree, with all parties in support. *Id.* at 1.

## DISCUSSION

### I. Legal Framework

A consent decree is a court order embodying the terms that the parties have negotiated and agreed upon; it is essentially a contract. *United States v. Alshabkhoun*, 277 F.3d 930, 934 (7th Cir. 2002) (citations omitted). Before entering the decree, the court must ensure it is fair, reasonable, adequate, and consistent with law. *United States v. BP Exploration & Oil Co.,* 167 F. Supp. 2d 1045, 1049 (N.D. Ind. 2001) (citing *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 616 F.2d 1006, 1014 (7th Cir. 1980)). The court must also ensure that "there has been valid consent by the concerned parties." *Metro. Hous. Dev. Corp.*, 616 F.2d at 1014. The purpose of this review is to determine whether the decree adequately protects the public interest—that is, it is not illegal, collusive, inequitable, or harmful to the common good. *BP Exploration,* 167 F. Supp. 2d at 1049.

The court need not determine the parties' precise legal rights or the merits of their claims, but merely whether the decree is appropriate under the particular facts of the case. *Metro. Hous. Dev. Corp.*, 616 F.2d at 1014. The court must also avoid substituting its own judgment for that of the settling parties; the test is not whether the court could fashion a better settlement. *BP Exploration,* 167 F. Supp. 2d at 1050 (citing, among other cases, *United States v. Cannons Eng'g Corp.,* 899 F.2d 79, 84 (1st Cir. 1990)). The court "may not deny approval of a consent decree unless it is unfair, unreasonable, or inadequate." *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 889 (7th Cir. 1985).

Further, in reviewing a proposed consent decree, the court must accord deference to the expertise of a party-agency and to the federal policy encouraging voluntary settlement of cases, *United States v. George A. Whiting Paper Co.*, 644 F.3d 368, 372 (7th Cir. 2011). Settlement is

7

especially attractive where "voluntary compliance by the parties over an extended period will contribute significantly toward ultimate achievement of statutory goals." *Metro. Hous. Dev. Corp.*, 616 F.2d at 1014 (citation omitted).

### A. Fairness

In assessing the fairness of a consent decree, the court must consider both procedural and substantive fairness, examining the following factors:

> [A] comparison of the strengths of plaintiffs' case versus the amount of settlement offer; the likely complexity, length, and expense of the litigation; the amount of opposition to the settlement among affected parties; the opinion of counsel; and the stage of the proceedings and amount of discovery already undertaken at the time of the settlement.

*Hiram Walker & Sons,* 768 F.2d at 889.

### B. Reasonableness

To evaluate the reasonableness of a consent decree, the Court should consider:

> (1) the nature and extent of potential hazards; (2) the availability and likelihood of alternatives to the consent decree; (3) whether the decree is technically adequate to accomplish the goal of cleaning the environment; (4) the extent to which the consent decree furthers the goals of the statutes which form the basis of the litigation; (5) the extent to which this Court's approval of the consent decree is in the public interest; and (6) whether the consent decree reflects the relative strength or weakness of the Government's case against the Defendants.

*BP Exploration*, 167 F. Supp. 2d at 1053.

### C. Adequacy and Fidelity to Statutes

When determining whether the settlement adequately compensates the plaintiff, the Court may not substitute its own judgment for that of the parties. *Cannons Eng'g Corp.,* 899 F.2d at 84. Regarding the adequacy of the relief secured by a consent decree, the Court "may not 'engage in an unrestricted evaluation of what relief would best serve the public.'" *United States v. Earthgrains Co.*, No. 00C1687, 2000 WL 33115903, at *14 (N.D. Ill. July 3, 2000)) (quoting *United States v. BNS, Inc.*, 858 F.2d 456, 462 (9th Cir. 1988) (approving consent decree

8

negotiated by Department of Justice in antitrust dispute). With environmental litigation, courts also consider "whether the decree is technically adequate to accomplish the goal of cleaning the environment." *See Wis. Elec. Power Co.*, 522 F. Supp. 2d at 1118.

Regarding consistency with law, the major consideration is "whether the decree comports with the goals of Congress." *BP Exploration*, 167 F. Supp. 2d at 1054 (citation omitted). This case implicates three environmental statutes: the CAA, the RCRA, and the CWA. The CAA aims "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1). In a similar vein, the RCRA is designed to serve the national policy of reducing generation of hazardous waste, and disposing of waste in ways that minimize threats to human health and the environment. *See* 42 U.S.C. § 6902(b). Finally, "the 'major purpose' of the CWA was 'to establish a comprehensive long-range policy for the elimination of water pollution.'" *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 179 (2001) (quoting S. Rep. No. 92-414, at 95 (1971)).

## II. Analysis

At the threshold, the Court notes that it accords substantial weight to federal and state environmental agencies' decision to settle as embodied in this decree, because of the agencies' expertise in environmental matters, *see BP Exploration,* 167 F. Supp. 2d at 1050, and the EPA's broad mandate from Congress to minimize threats posed by hazardous wastes, *see National-Standard Co. v. Adamkus*, 881 F.2d 352, 360 (7th Cir. 1989) (citing 42 U.S.C. § 6902(b)). Also weighing in favor of entering this decree is the federal public policy preference for voluntary settlement by the parties. *George A. Whiting Paper Co.*, 644 F.3d at 372.

Regarding the validity of consent to this Decree, all parties here have agreed to and signed the Consent Decree, which they appear to have negotiated at arm's length. There is no indication of collusion, coercion, or duress. *See Metro. Hous. Dev. Corp.*, 616 F.2d at 1014; *BP Exploration,* 167 F. Supp. 2d at 1049.

**A. Fairness**

The Governments have been gathering evidence about the Defendant's manufacturing facilities since 2004 and 2005. Compl. ¶¶ 9, 12. The EPA has likely built a strong case against PolyOne given this extended period of surveillance to gather evidence and the agency's familiarity with these statutory regimes. The number and extent of the statutory violations the Consent Decree recites bolster this conclusion.

The Complaint alleges 26 violations dating back to 2004 and requests civil penalties between $27,500 and $37,500 per day, per violation. Compl. 31–32. While the facility upgrades and procedural changes the Consent Decree mandates—along with the fine of $245,000 plus interest—will come at a cost to PolyOne and Mexichem, there is little doubt that the terms of the Decree are far less financially exacting than the companies' full potential statutory liability.

Additionally, the Court is not aware of any opposition to the decree, whether from PolyOne, Mexichem, or any third parties. The general public—including any interested third parties—was given notice of and an opportunity to comment on the Consent Decree, but did not do so. Finally, the Consent Decree staves off expensive, lengthy, and complex litigation. The Court, therefore, can identify no factor that indicates the Decree is unfair. *See Hiram Walker & Sons,* 768 F.2d at 889.

### B. Reasonableness

The potential hazards at issue in this case are serious. Vinyl chloride has carcinogenic and other harmful effects; accidental releases of this chemical could cause serious injury to the workers, nearby communities, and the environment. The New Jersey and Illinois facilities routinely handle hazardous waste, and protecting the public interest requires compliance with environmental laws regulating such waste. The Consent Decree serves these interests by imposing monetary penalties, injunctive relief, and compliance requirements on the facilities' operators.

Entering this Decree is a practical and efficient means of resolving the underlying dispute. In comparison with this settlement, other dispute-resolution methods would likely delay relief, prolong the status quo at the manufacturing facilities, and provide no guarantee of realizing the remedial efforts agreed to in the Decree. Further, the absence of public objection weighs in favor of the reasonableness of this settlement. Accordingly, the Court finds that the consent decree is reasonable. *See BP Exploration*, 167 F. Supp. 2d at 1053.

### C. Adequacy and Fidelity to the Statutes

The Court's role is not to determine whether the Decree embodies the best possible outcome for environmental and health interests, but merely to make the less in-depth determination of whether the Decree is "technically adequate" to accomplish its goals. *See Wis. Elec. Power*, 522 F. Supp. 2d at 1118. The Court finds that the Decree meets this low standard. The Decree serves the policies espoused by Congress in adopting the CAA, RCRA, and CWA. *See BP Exploration*, 167 F. Supp. 2d at 1054.

For example, the Supplemental Environmental Projects mandated by the Decree are specifically designed to reduce the risk of any future environmental contamination during a

power outage or similar emergency. Reducing the risk of pollution squarely advances the purposes of these statutes and protects the public interest. *See* 42 U.S.C. § 7401(b)(1); 42 U.S.C. § 6902(b); *Solid Waste Agency*, 531 U.S. at 179. Additionally, the Decree requires Mexichem to operate the facilities in accordance with new, more stringent emissions standards that are not set to be enforced industry-wide until April 2015. *See* 77 Fed. Reg. 22848. By entering the Decree today, the environment and community stand to reap the benefits of lower emissions from these facilities almost 10 months earlier. This component of the Decree not only advances the purposes of the environmental statutes, but accomplishes more in service of these interests than otherwise achievable under current law. Accordingly, the Court finds that the Consent Decree is adequate and consistent with law. *See BP Exploration*, 167 F. Supp. 2d at 1049.

## CONCLUSION

Plaintiff United States of America's joint Motion to Enter Consent Decree, ECF No. 7, is GRANTED. The Clerk is directed to file the signed Consent Decree and enter judgment, closing these cases.

Entered this 19th day of June, 2014.

s/ Sara Darrow<br>
SARA DARROW<br>
UNITED STATES DISTRICT JUDGE